In Re the Matter of: DIVISION
OF FAMILY SERVICES,
Petitioner,

v.

T.W. TA. W., Respondent.

In the Interest of: A.W. DOB: 11.06.01
Th. W. DOB: 11.20.02.

File No. CK03–07330.

Family Court of Delaware.
Sussex County.

Submitted: Feb. 6, 2004.

Decided: April 7, 2004.

James S. Reichert, Esquire, the Department of Justice, Georgetown, Counsel for the State.

Margaret R. Cooper, Esquire, Hudson, Jones, Jaywork, and Fisher, Georgetown, Counsel for T.W. and Ta. W.

HENRIKSEN, J.

On February 6, 2004, the Court held an adjudicatory hearing on the pending Petition of Dependency/Neglect filed by the Division of Family Services in Kent County, Delaware on October 2, 2003. At the same time, the Court also considered the Petition for Substantiation filed by the Division in which they are seeking a finding that Ta. W. ("mother") and T.W. ("father") should be placed on the Child Protection Registry at Level IV. At the conclusion of the hearing, the Court announced on the record its decision as to a finding of dependency concerning the children. The Court reserved its decision on whether the parents were substantiated for placement at Level IV on the Child Protection Registry.

Present at the hearing were Nicole Mosley and Amy Hughes of the Division, represented by their attorney, James S. Reichert, Esquire; T.W. and Ta. W., represented by their Court-appointed attorney, Margaret R. Cooper, Esquire; and Courtney Riordan, Esquire, the Court-appointed attorney guardian *ad litem* for the children. In coming to its decision, the Court heard the testimony of Angela Garvin, the children's licensed day care worker; W.P., the children's maternal grandfather; Nicole Mosley, the family crisis therapist for DFS; and both of the parents.

## BACKGROUND

This case originated in Kent County, Delaware when the Honorable William N. Nicholas entered an *Ex Parte* Custody Order on October 2, 2003 finding that the children were dependent, neglected and/or abused by reason of the failure of the natural parents to pick up the minor children from their day care center. A preliminary protective hearing was then held in Kent County before the Honorable William J. Walls, Jr. on October 8, 2003. Based upon the agreement of the parties and the information presented to the Court, Judge Walls found that the minor children continued to be dependent or neglected and that probable cause existed to continue temporary custody of the children with the Division of Family Services.

On November 3, 2003 the Division of Family Services, through their offices in Kent County, filed in the Family Court in Kent County a Petition for a Substantiation. The petition asked that the parents of the above-named minor children be substantiated for abuse or neglect and be placed on the Child Protection Registry at Child Protection Level IV. Level IV is the most serious level of protection.

On November 6, 2003 the Division filed an Amended Petition for Dependency/Neglect. The amended petition included additional allegations stating that the parents have a history of alcohol and drug abuse, and also alleged recent use by the parents of crack cocaine. The amendments also alleged that the parents were homeless, unemployed, and without any transportation.

The matter was scheduled for an adjudicatory hearing in the Kent County Family Court on November 14, 2003. Judge Pyott's Order of November 14, 2003,

mailed December 12, 2003, indicated that there was an agreement by the parties that the children remain in care, although the parents disputed the allegations contained in the petition. Rather than hold an adjudicatory hearing on that date, the matter was transferred to Sussex County apparently because the parents were then residing in Sussex County. The Court learned that the parents only briefly resided in Sussex County, and now reside in Salisbury, Maryland.

On January 6, 2004, the Court was prepared to hold an adjudicatory hearing at the Delaware Family Court located in Sussex County. Because of the confusion involved in the transfer of the file from Kent County to Sussex County, mother had been advised by her Sussex County contract attorney not to attend the hearing. The parents had previously been represented by the dependency contract attorney in Kent County. Parents' Sussex County contract attorney had believed that the adjudicatory hearing had already been held in Kent County, and that the mere purpose of the hearing in Sussex County was going to be a dispositional review hearing of the case plan. Upon close review of the file, all parties agreed that the next hearing to occur in Sussex County was the adjudicatory hearing on all allegations in the original complaint, including the amended allegations. The Court also determined that the Petition for Substantiation which had been filed in Kent County would be joined with the adjudicatory hearing to be held in Sussex County.

### FACTS

Having had the opportunity to hear the testimony and observe the demeanor of all of the witnesses, the Court has determined the following facts to be accurate. Sometime during July or August of 2003 the parents and children moved from their residence in the State of Georgia to live in the home of mother's father, hereinafter referred to as "grandfather", who lives in the State of Delaware. The parents were seeking a fresh start for their family. Grandfather indicated that both parents were working and that both parents were providing adequate and appropriate care to their then two (2) and one (1) year old children. According to Angela Garvin, a licensed day care provider at the Golden Child Care Center, parents enrolled and brought the children to day care continuously from August 29, 2003 until October 2, 2003. According to Ms. Garvin, the children were generally appropriately clothed. Also, both parents took turns in dropping off and picking up the children. They were sometimes tardy. The parents had named grandfather, and mother's adult sister as persons the day care center should contact in the event either of the children were involved in an emergency and the parents could not be reached.

Prior to October 2, 2003, there was only one (1) occasion in which grandfather had to pick the children up at the day care center. That occurred when father, a veteran, was delayed in traffic when returning from an appointment he had at the Veterans' Hospital. Father contacted grandfather by telephone to ascertain whether grandfather would pick the children up at day care, and grandfather agreed to do so.

On October 1, 2003, the parents and their children left grandfather's home sometime in the afternoon without telling anyone where they were going. According to mother, the parents and their children drove around in their car most of the evening, and stayed in the car. By mother's admission, the parents were using crack cocaine in the car in the presence of their children.

On the morning of October 2, 2003, mother took the children to Angela Garvin's day care center. According to Ms. Garvin, mother appeared somewhat distant, and did not enter into the house. Mother basically directed the children to go into the house when Ms. Garvin met mother and children at the door. Ms. Garvin noticed immediately that the children were wearing the same clothes from the day before, and that their diapers were saturated and smelled of urine. The children also brought containers of spoiled milk. Although mother said she would be right back with a change of clothes, mother never returned.

Sometime during the afternoon of October 2, 2003, between 2:00 p.m. and 5:00 p.m., a series of telephone calls occurred after the day care worker noted that young Th. was running a high fever. Ms. Garvin attempted to contact the parents at their places of employment, but was unsuccessful. She then called the grandfather around 3:30 p.m. and informed him that the child was running a fever. Grandfather informed Ms. Garvin that he had not seen the parents since the prior evening. Grandfather also told the day care worker to contact the Division of Family Services because he was "tired of this." Grandfather then called approximately three (3) times every hour up until about 5:30 p.m. to find out if the parents had picked up the children. The day care worker contacted the Division of Family Services between 5:30 p.m. and 6:00 p.m. The Division picked up the children. Grandfather never offered to pick up the children. Mother's sister had appeared at the day care center, but did not offer to take the children with her.

Around 6:00 p.m. on the evening of October 2, 2003, father made a telephone call to grandfather. Although the wording of this call is disputed by father and mother, the Court believes that grandfather accurately reported the substance of the call which went something like this:

Father: "We're on our way to the hospital, Ta. is bleeding, can you pick up the kids?"

Grandfather: "I already called DIFIS (this is how grandfather referred to the Division), and the kids are being taken care of."

Grandfather said there was thereafter a pause on the phone, after which both parties hung up at about the same time. Grandfather acknowledged that he did not tell father that the one child was ill.

Grandfather testified that he did not believe father when he told grandfather that he was taking mother to the hospital. Indeed, both mother and father reported several conversations with grandfather around 6:00 p.m. on October 2, 2003. Although grandfather only remembers one (1) conversation, there may have been a couple of conversations in which both mother and father spoke to grandfather. In one (1) alleged conversation, the parents told grandfather that they did not have enough time to pick up the children, but they were en-route, and could grandfather pick up the children. Grandfather said "no" and sounded quite irritated. More than likely, grandfather detected over the telephone the impaired speech of the parents, and grandfather was angry with them for allowing themselves to become drugged or intoxicated. According to the parents, either in the same conversation, or in a subsequent telephone conversation, they then told grandfather that mother was bleeding and they were going to the hospital. This corresponds to the testimony given by grandfather. The most important part of this scenario was that father and mother were lying to grandfather. Mother and father admitted they were not on the way to the hospital,

mother was not bleeding, and the parents did not go to the hospital that night. Furthermore, whether or not mother and father understood that grandfather had said the children were with the Division of Family Services, father and mother were clearly leaving things to chance that the kids were safe with grandfather. According to father following one (1) of the alleged telephone conversations with grandfather, father told mother that "maybe [grandfather] did go pick them up."

Clearly, the parents were impaired, under the influence of drugs and/or alcohol. They both acknowledged that they both have had prior considerable histories of drug and alcohol abuse. Rather than pre-arrange certain care for their children prior to going off to satisfy their own illegal needs, the parents left to chance the safety and whereabouts of their children while they engaged in their illegal use of drugs and over-indulgence in alcohol.

According to grandfather, the next time he heard from the parents was two (2) to three (3) days later when the parents said they were on their way home and would be there "in a minute." At that time, grandfather told the parents to pick up their personal items and move out. Contrary to grandfather's recollection, mother said she contacted grandfather by telephone on Thursday evening, and grandfather would not tell her where the children were. Mother also said she contacted grandfather by telephone on Friday morning, at which time grandfather again told mother that the children were in the custody of DFS.

The parents remained on their drug and alcohol binge until early Saturday morning around 4:00 a.m. At that time, they first went to Kent General Hospital, then to the St. Jones section of Kent General, and then spent the balance of the early morning at the Dover Police Department.

From the police station, the parents were taken to Kirkwood Detox on Saturday morning and remained their until Monday morning, October 6, 2003.

The parents first contacted Nicole Mosley at the Division of Family Services by leaving a message with her on Monday, October 6, 2003. The parents met with Ms. Mosley the next day, October 7, 2003.

At the time of the hearing the parents were renting a room from a friend in Salisbury, Maryland. Father indicated that he and his wife were in the process of purchasing approximately three (3) acres of real estate in Maryland, and plan to build a home there. Mr. Reichert of the Division reminded the parents that they will not be entitled to receive Delaware reunification services if they reside in Maryland. Father said he understood that he would not be able to receive such services and indicated that he had sufficient insurance to cover various services. It appeared that father was still working. Grandfather indicated that father was last making tents for the military. Mother was working at the hospital medical center in Salisbury. The exact nature of mother's employment at the hospital was unclear to the Court.

The parents were ready to enter into a case plan with the Division, although they realized the State of Delaware cannot provide services to the parents while they reside in Maryland.

Upon questioning by the attorney guardian *ad litem*, father acknowledged that the grandfather was disabled, and would not have been able to care for the children on his own. Making another assumption, father assumed that grandfather would get the assistance of mother's sister to help out while mother and father were out binging.

## DEPENDENCY

■ A photograph of the children taken December 31, 2003 was placed into the record.

The Court found and ordered on the record that the children were dependent based upon the parents immediate lack of suitable housing and acknowledged problems with drugs and alcohol. As such, the Court found that it was in the children's best interest to remain in the custody of the Division of Family Services, and that it would be contrary to the general welfare and safety of the children to be returned to the parents at the time. Given the finding of dependency, the Court noted that the goal in the case would be for the Division to make reasonable efforts towards the reunification between the parents and children. Unfortunately, given the choice of the parents to reside outside the State of Delaware, the Delaware Division of Family Services was not required to provide services to the parents. The Court also found that the Division was not required to make reasonable efforts to keep the children in the parents' home or to place the children with a relative since the parents were not available when taken into custody and the immediate known relatives were unwilling to take the children. The Court also scheduled a one (1) hour dispositional review hearing to be held at 11:00 a.m. on March 5, 2004 in order to review the case plan between the Division and the parents, and also to review the status of the safety and welfare of the children.

## CHILD PROTECTION REGISTRY

■ The court reserved its finding on whether the division had met its burden to substantiate the parents for placement on the Delaware Child Protection Registry at Level IV.

The Division argued that the above set of facts demonstrated that the parents abandoned their children in that they failed to make advance secure arrangements to watch their children. In fact, the parents had no definite knowledge as to the whereabouts of their children from October 2nd to October 6th. On October 1st, the parents drove around in a car using illegal drugs with their children present. The parents made the voluntary choice to become impaired through drug and alcohol use which set in motion these deplorable circumstances. The parents had experienced prior drug episodes in their life They should have been aware of the adverse affects the drugs and alcohol use would have upon them. The Division therefore argued that the children should be found both dependent and neglected, and that the parents should be substantiated for Level IV on the Child Protection Registry. Instead of making prior arrangements for the care of their children, the parents attempted to make last minute arrangements for their children through a lie, and they gambled on the safety of their children.

The parents acknowledged that there should be a finding of dependency. However, they argued against a finding of neglect. According to the parents, they had no intent of abandoning their children and believed, although incorrectly, that their children were in the care of the grandfather. They also noted the testimony of both the day care provider and the grandfather which indicated that the parents had for several months been providing appropriate and adequate care to the children, except for this one (1) serious and deplorable lapse which lasted over four-and-a-half (4–1/2) days. Furthermore, it was the parents' argument that alcohol and substance abuse are considered an affliction, a disease, where assistance is given by the Division in trying to correct

these problems for parents so that they can be reunified with their children over a period of time. As such, the parents argued that these concerns of alcohol and substance abuse generally lead to a finding of dependency, but not neglect. The parents believed that for there to be a finding of abandonment, the inaction of a parent must be on-going and daily in nature. The parents asserted that this particular incident was an isolated act, not daily in nature, and therefore did not qualify for a Level IV placement on the Child Protection Registry.

The Court-appointed attorney guardian *ad litem* (GAL), expressed his concern that a Level IV placement on the Child Protection Registry might limit the ability of the parent to work, which would then limit the ability of the parent towards reunification with the children. The GAL believed that there needed to be proof of an intent to abandon the children, and that he did not feel the facts reflected that the parents had intended to place the children in harm. The Division attorney, however, responded with his belief that the purpose of Title 16, Section 921, the Child Protective Registry, was for the safety of children in the State, and not intended to protect parents in keeping their jobs.

The Delaware Child Protection Registry, which became effective February 1, 2003, can be found beginning at Section 921 of Title 16 of the Delaware Code. The stated purpose of the Child Protection Registry is *"To protect children and to insure the safety of children in child care, health care and public educational facilities. This subchapter must be liberally construed so that these purposes may be realized."* [2] Section 923 of Title 16, then establishes four (4) different and increas-

ing levels of child protection which relate to the risk of future harm to children. Persons are then entered on the Child Protection Registry at their designated child protection level. Each level also provides for certain consequences to the offender, including their eligibility for employment in a child care facility, health care facility or public school.

Child Protection Level I involves an incident of abuse or neglect, including emotional neglect, presenting a low risk of future harm to children. A person substantiated at Level I will not be entered on the Child Protection Registry and continues to be eligible for employment in a child care facility, health care facility or public school.[3]

Persons substantiated for Child Protection Level II are those who committed an incident of abuse or neglect, including severe emotional neglect, presenting a moderate risk of future harm to children. Such a person is placed on the Child Protection Registry at Level II for a period of three (3) years, after which the person's name will be automatically removed. A Level II person continues to remain eligible to work in a child care facility, health care facility or public school, although a prospective employer making a Child Protection Registry check must be informed of the registration while the person is still on the registry.[4]

Child Protection Level III becomes more complex. In such a case, the incident of abuse or neglect presents a high risk of future harm to children, and includes physical injury, non-organic failure to thrive, malnutrition, or abandonment of a child thirteen (13) to seventeen (17) years of age. A Level III person's name

2. Delaware Code, Tit. 16, § 921.

3. Delaware Code, Tit. 16, § 923(b)(1).

4. Delaware Code, Tit. 16, § 923(b)(2).

goes on the registry for a period of seven (7) years, which is automatically removed from the registry after seven (7) years, so long as they are not substantiated for a different incident of abuse or neglect within the seven (7) year period. Most importantly, a Level III person is ineligible for employment in a child care facility, health care facility or public school so long as they are on the registry.[5]

Persons found at Level II or III on the Registry may petition the Family Court for early removal from the Registry if they have successfully completed a Division-recommended and a Family Court-ordered case plan.[6] Such an early removal means that persons named will be removed from the Registry and may no longer be reported to employers. However, the information will remain in the Division's internal informational system for other purposes which, among other things, may adversely affect a parent's later ability to obtain a child care license or act as a foster or adoptive parent.[7]

The most serious level for a substantiation is Child Protection Level IV. This involves incidences which present the highest risk of future harm to children such as serious physical injury, sexual abuse, torture, criminally negligent treatment, or abandonment of a child twelve (12) years of age or younger. It is this last provision, *"abandonment of a child twelve (12) years of age or younger"*, upon which the Division relies in seeking a Level IV substantiation as to mother and father in this case.

A Level IV substantiation places the person's name on the registry forever. A Level IV substantiation also makes the person ineligible for employment in a child care facility, health care facility or public school, forever. Although Level II and Level III substantiations allow for early removal, there is no provision for the Level IV substantiated person to petition a Court for removal of their name from the registry.[8]

It should be noted that each of the levels, in addition to setting forth increasing levels of risk of future harm to children, also set forth certain enumerated types of criminal convictions, which *"when based on the same incident of abuse or neglect as alleged in the Notice of Intent to Substantiate,"* will lead to placement on the registry at the assigned level. As one would expect, the seriousness of these specifically enumerated criminal offenses increases as the Registry levels increase. Thus, a criminal conviction of a violation of compulsory school attendance or requirements of truancy, if also identified by a Notice of Intent to Substantiate, will lead to a Level I placement.[9] A conviction of Interference with Custody if also identified by a Notice of Intent to Substantiate will lead to a Level II placement.[10] Conviction of several more serious enumerated crimes, when also identified in a Notice of Intent to Substantiate, will lead to a Level III placement. Some of these enumerated offenses include Offensive Touching, Assault in the Third Degree, Unlawful Administration of Drugs or Controlled Substances, Indecent Exposure, Sexual Harassment, Abandonment of a Child, or misdemeanor Endangering the Welfare of a Child.[11] Likewise, a Level IV placement contains the most serious enumerated

---

5. Delaware Code, Tit. 16, § 923(b)(3).

6. Delaware Code, Tit. 16, § 929(b).

7. Delaware Code, Tit. 16, § 929(d).

8. Delaware Code, Tit. 16, § 923(b)(4).

9. Delaware Code, Tit. 16, § 923(b)(1)b.

10. Delaware Code, Tit. 16, § 923(b)(2)b.

11. Delaware Code, Tit. 16, § 923(b)(3)b.

criminal acts. Without naming all of them, they cover such charges as Vehicular Assault, Assault in the First or Second Degree, Murder, Manslaughter, Incest, Rape, Unlawful Sexual Contact, Unlawfully Dealing in Child Pornography, Sexual Exploitation of a Child, or promoting suicide.[12]

Although not dispositive of this case, it is interesting to note that a criminal conviction of any of the specific crimes specifically enumerated in the various statutorily established levels of protection will require a designation at that specific registry level if the same conduct is contained in the Notice of Intent to Substantiate which the Division is required to issue in all cases in which they seek to place an individual on the Registry.[13] Thus, the conviction itself does not appear to place the individual on the Child Protection Registry. However, the conviction is conclusive as to placement on the Registry at the statutorily determined level if the Division chooses to issue the notice of their intent to substantiate.[14]

Thus, the Division must issue a Notice of Intent to Substantiate if they desire a person to be registered. However the duty of the Division to file a Petition for Substantiation is stayed pending the outcome of a criminal or delinquency proceeding involving the same conduct.[15] It therefore appears that a conviction in the criminal matter removes the need for the filing of a Substantiation Petition as well as the hearing itself.

If, however, the accused is acquitted, or the charge is dismissed in the criminal or juvenile delinquency proceeding which requires the strict criminal burden of proof of a finding beyond a reasonable doubt, the Division may still go forward with the filing of a Petition to Substantiate where the burden of proof at the substantiation hearing is the less strict civil standard of the preponderance of the evidence.[16]

As already noted, the Division in this case is seeking a finding that the parents abandoned their young children under twelve (12) years of age, and therefore should be placed on the Delaware Child Protection Registry at the most serious level, Level IV. As has just been pointed out, the statutory provisions of Title 16, Section 923 provide for substantiation at Level IV where there has been an "abandonment of a child twelve (12) years of age or younger."[17]

The term "abandonment" or "abandoned" has different statutory definitions within the Delaware Code. Thus, "Abandonment of a Child" as defined in Delaware's Criminal Code is a misdemeanor defined as *"A parent, guardian or other person legally charged with the care or custody of a child less than 16 years old [and] deserts the child in any place intending _permanently_ to abandon it."*[18] (emphasis added).

The term "abandoned" is defined quite differently where the Court is considering whether to terminate parental rights for an adoption. In order to find that a child was intentionally abandoned, the Court must find a failure of the parent for at least 6 consecutive months (emphasis added) to communicate or visit regularly with the child, and also manifest the ability and willingness to assume custody of the child where the child has not been in the custo-

---

12. Delaware Code, Tit. 16, § 923(b)(4)b.

13. Delaware Code, Tit. 16, § 924.

14. Delaware Code, Tit. 16, § 927(b).

15. Delaware Code, Tit. 16, § 927(a).

16. Delaware Code, Tit. 16, § 926 and 927(c).

17. Delaware Code, Tit. 16, § 923(4)a.

18. Delaware Code, Tit. 11, § 1101.

dy of the other parent.[19] The Court may also terminate parental rights without finding a specific intent to abandon where a somewhat similar lack of contact existed for at least 12 consecutive months of the 18 months (emphasis added) preceding the filing of the Petition to Terminate.[20]

The term "abandonment" is not given a statutory definition under the Child Protection Registry legislation. However, Title 16, Section 923(a) of the Delaware Code authorizes the Division of Family Services of the Department of Services for Children, Youth and Their Families to adopt *"regulations that assess the risk of future harm to children from acts of abuse or neglect and designate Child Protection Levels."* The Delaware Supreme Court has long held that regulations mandated and delegated by the Legislature to be created by a Delaware government agency have the force of law.[21] The Department's Regulation 10.1.1 concerning abandonment of children zero (0) to twelve (12) is defined as follows:

> *The parent/caretaker fails to assume or refuses to assume responsibility to provide basic care for a child on a daily basis. The basic care consists of food, clothing, shelter, medical care, reasonable and consistent financial support, and the maintenance of regular communication/contact between the parent/caretaker and child.* (Emphasis added).

Regulation 9.1.1 contains almost identical wording to the previously-quoted regulation, except that it involves abandonment for children ages thirteen (13) to seventeen (17), and would lead to a Level III substantiation. A recent decision of this Court emphasized that, *"By definition, in order for there to be a finding of abandonment, the inaction of a parent must be ongoing and daily in nature. By definition, a single act at a moment in time is not the basis for a finding of abandonment."*[22]

In the case *sub judice*, the parents committed a serious violation of their parental responsibilities when they went on a drug and alcohol binge for a six (6) day period from October 1 through October 7, 2003. They very carelessly believed that their children would be picked up at the day care center by mother's father, which did not occur. Given a prior experience, however, it was certainly within the realm of possibility that mother's father would have retrieved the children from the day care center in the parents' absence. Moreover, testimony from all parties indicated that these parents had provided adequate and appropriate care to their children over the several months from July or August of 2003 up until the events of October 1, 2003. Although these parents committed a serious breach of their parental duties when they made their voluntary choice to become impaired through drug and alcohol abuse for a period which lasted several days, the Court does not find that this one (1) episode lasting six (6) days falls within the definition of failing in your parental responsibilities on a daily basis. There were many days for several months leading up to this event where these parents provided appropriate and adequate care to their children on a daily basis. Six (6) days of extremely poor judgment at the end of a two (2) month period of appropriate and adequate care does not qualify for

---

19. Delaware Code, Tit. 13, § 1103(a)(2)a.2.

20. Delaware Code, Tit. 13, § 1103(a)(2)b.

21. *Sammons v. Ridgeway*, 293 A.2d 547 (Del. 1972).

22. *In the Interest of M.S. born September 29, 1988*, 2003 WL 22476258 (Del.Fam.Ct., Millman, J., October 8, 2003).

a daily basis finding of abandonment. The Court also does not find an intent by the parents to abandon their children; however, they clearly had the intent to feed their unfortunate habit which led to their children being placed in potential harm's way.

■ Thus, the Court does not find that these parents should be substantiated for a Level IV placement on the Child Protection Registry. Such a decision makes sense in that these parents did not act under circumstances analogous to the previously noted statutorily enumerated criminal offenses denoting the highest risk of future harm to children. However, the parents' conduct in this matter clearly posed a risk of future harm to their children greater than a low risk of harm.

Regulation 10.1.5, also pertaining to Child Protection Level IV status, involves a parent who leaves a child six (6) or younger alone or without a substitute caretaker. In this case, the parents took the child to the caretaker, even while under the influence of alcohol or drugs, and had a possible, although extremely careless, expectation that mother's father would retrieve the children from the caretaker at the end of the day.

Regulation 9.1.6 pertaining to Level III status, involves a lack of supervision for children who are age six (6) and younger. The definition includes *"incidents in which the parent/caretaker is physically present,* *but is not attending to the child due to behavior such as substance abuse."* It is this regulation which most closely correlates with the conduct of the parents in this case. These parents made a voluntary decision to indulge in their drug and alcohol habits, thereby placing the safety and well-being of their children in jeopardy by assuming that mother's father would retrieve the children from the day care center and thereafter care for the children, but without first receiving father's agreement that he would do so. These parents also exposed their children to their own unlawful use of drugs and alcohol by having the children with them in the car overnight while the parents indulged in their illegal habits.

Based upon the foregoing, the Court finds by a preponderance of the evidence that T.W. and Ta. W. committed an act of neglect and are hereby SUBSTANTIATED for placement at Level III on the Delaware Child Protection Registry.

IT IS SO ORDERED this 7th day of April, 2004.

